

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

ENTERED
12/28/2011

| | | |
|---|---|---|
| IN RE:<br>**APEX  LONG TERM ACUTE CARE -**<br>**KATY, L.P.; dba APEX HOSPITAL; dba**<br>**APEX HOSPITAL - KATY,**<br>     Debtor. | §<br>§<br>§<br>§<br>§<br>§<br>§ | **Case No. 09-37096**<br><br><br>**Chapter 11** |
| **WILLIAM G. WEST, TRUSTEE,**<br>     Plaintiff<br><br>vs.<br><br>**FREEDOM MEDICAL, INC.,**<br>     Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 11-3213** |
| **WILLIAM G. WEST, TRUSTEE,**<br>     Plaintiff<br><br>vs.<br><br>**HILL-ROM COMPANY, INC.,**<br>     Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 11-3310** |
| **WILLIAM G. WEST, TRUSTEE,**<br>     Plaintiff<br><br>vs.<br><br>**RECOVERCARE, L.L.C.**<br>     Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 11-3422** |
| **WILLIAM G. WEST, TRUSTEE,**<br>     Plaintiff<br><br>vs.<br><br>**REDISTAFF, L.L.C.,**<br>     Defendant. | §<br>§<br>§<br>§<br>§<br>§ | **Adversary No. 11-3423** |

## MEMORANDUM OPINION

This memorandum opinion resolves four separate adversary proceedings. In each proceeding, the Distribution Trustee under Apex Long Term Acute Care – Katy, L.P.'s confirmed bankruptcy plan sued for avoidance of preferential transfers under § 547 of the Bankruptcy Code. The Court approved the compromise of three of the adversary proceedings in Apex's main bankruptcy case. The Trustee now seeks dismissal with prejudice of these three adversary proceedings. In the fourth adversary proceeding, the Trustee seeks entry of a default judgment.

A dismissal with prejudice is an adjudication on the merits of the claim. *Anthony v. Marion Cnty. Gen. Hosp.*, 617 F.2d 1164, 1169-70 (5th Cir. 1980). A default judgment is enforceable as the judgment of the Court. Accordingly, the Court must consider whether it has constitutional authority to adjudicate the four proceedings. *Stern v. Marshall*, 131 S.Ct. 2594, 2609 (2011).

To provide background for the constitutional question, the Court first discusses the relevant facts of each proceeding.

In *West v. Freedom Medical, Inc.*, No. 11-3213, the Trustee sued for the avoidance and recovery of preferential transfers in the amount of $19,140.19 plus pre- and post-petition interest. Freedom Medical had filed a $53,341.76 unsecured proof of claim. The Trustee also sought disallowance of Freedom Medical's claim under § 502(d). The Trustee additionally objected to the amount of Freedom Medical's claim.

In *West v. Hill-Rom Company, Inc.*, No. 11-3310, the Trustee sued for the avoidance and recovery of preferential transfers in the amount of $6,934.43 plus pre- and post-petition interest.

Hill-Rom had filed an $8,000.52 unsecured proof of claim. The Trustee also sought disallowance of Hill-Rom's claim under § 502(d).

In *West v. Redistaff, L.L.C.*, No. 11-3423, the Trustee sued for the avoidance and recovery of preferential transfers in the amount of $25,920.00 plus pre- and post-petition interest. Redistaff had not filed a proof of claim. However, because Apex's bankruptcy schedules reflected that Redistaff had an unsecured claim against the estate, the Trustee sought the disallowance of any claim Redistaff had under § 502(d).

Finally, in *West v. RecoverCare, L.L.C.*, No. 11-3422, the Trustee sued for the avoidance and recovery of preferential transfers in the amount of $28,048.86 plus pre- and post-petition interest. RecoverCare had not filed a proof of claim, but Apex's bankruptcy schedules showed that RecoverCare had an unsecured claim. The Trustee seeks the disallowance of any claim RecoverCare has under § 502(d).

The Court grants the three motions to dismiss and the motion for default judgment.

## Analysis

The United States Constitution protects the "judicial Power of the United States" by guaranteeing that Article III judges will have lifetime tenure without diminution of salary. Because bankruptcy judges have neither lifetime tenure nor a guarantee that their salaries will not be reduced, they may not exercise the judicial power of the United States. *Stern*, 131 S.Ct. at 2609 ("[T]he judicial power of the United States may be vested only in courts whose judges enjoy the protections set forth in [Article III]."). Bankruptcy judges therefore may not enter final judgments or orders in matters that fall within the exclusive authority of the Article III judiciary.

Following the Supreme Court's decision in *Stern*, which recognized significant limitations on bankruptcy judges' authority, this Court—like other bankruptcy courts—has

carefully considered the extent of its authority to decide many types of matters. *E.g.*, *Hill v. New Concept Energy, Inc. (In re Yazoo Pipeline Co., L.P.)*, --- B.R. ----, 2011 WL 4902960, at *1-*2 (Bankr. S.D. Tex. Oct. 14, 2011); *Special Value Continuation Partners, L.P. v. Jones*, 2011 WL 5593058, at *6 (Bankr. S.D. Tex. Nov. 10, 2011); *West v. Avery (In re Noram Resources, Inc.)*, 2011 WL 5357895, at *1-*3 (Bankr. S.D. Tex. Nov. 7, 2011); *Sanders v. Muhs (In re Muhs)*, 2011 WL 3421546, at *1-*2 (Bankr. S.D. Tex. Aug. 2, 2011).

The Court now determines its authority to decide suits to avoid preferential transfers under § 547 of the Bankruptcy Code. Preferential transfers are among the most difficult types of claims to classify. On the one hand, the right to avoid preferential transfers is established by the Bankruptcy Code itself, not by state law. The recovery of preferences has long been considered an integral part of the bankruptcy process. *See Central Va. Cmty. College v. Katz*, 546 U.S. 356, 372 (2006) ("[T]hose who crafted the Bankruptcy Clause would have understood it to give Congress the power to authorize courts to avoid preferential transfers and to recover the transferred property. Petitioners do not dispute that that authority has been a core aspect of the administration of bankrupt estates since at least the 18th century.").

Conversely, Supreme Court precedent seems to indicate that the public rights doctrine—the major exception allowing non-Article III tribunals to adjudicate disputes—does not apply to preferential transfer actions when the defendant has not filed a proof of claim in the bankruptcy case.

Prior to *Katz,* the Supreme Court issued several decisions on jury rights in preference actions. In *Schoenthal v. Irving Trust Co.*, the Supreme Court held that defendants in a preference action were entitled to a trial by jury. 287 U.S. 92, 96 (1932). According to the *Schoenthal* Court, preference suits had their basis in "common-law actions of trover and money

had and received," which "were resorted to for the recovery of preferential payments by bankrupts." *Id.*at 94. Therefore, preference actions were legal in nature and could not be pursued in equity "in the absence of a clear showing that a court of law lacks capacity to give the relief which the allegations show plaintiff entitled to have." *Id.* at 95. The *Schoenthal* Court further noted that "[s]uits to recover preferences constitute no part of the proceedings in bankruptcy but concern controversies arising out of it."

In *Langenkamp v. Culp*, the Supreme Court similarly stated (this time in dicta) that "[i]f a party does *not* submit a claim against the bankruptcy estate, . . . the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial." 498 U.S. 42, 45 (1990).

*Langenkamp* built on the Supreme Court's decision the year earlier in *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989). In *Granfinanciera*, the Supreme Court held that a fraudulent transfer claim is "more accurately characterized as a private rather than a public right as we have used those terms in our Article III decisions" and that a defendant who had not filed a proof of claim in the debtor's bankruptcy case was entitled to a jury trial. 492 U.S. at 50-58. The *Granfinanciera* Court also said that "the question whether the Seventh Amendment permits Congress to assign [a cause of action's] adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal." 492 U.S. at 53. If the Seventh Amendment question requires the same answer as the Article III question, the *Schoenthal/Katchen/Langenkamp* line of cases implies that preference actions may not be public rights disputes.

5 / 26

This chart summarizes the development of the law in the major Supreme Court decisions that discuss, directly or indirectly, the nature of preference actions:

| Case | Year | Legal Conclusions |
|---|---|---|
| *Schoenthal v. Irving Trust Co.* | 1932 | • Preference actions are legal, not equitable, actions.<br>• A defendant in a preference action is therefore entitled to a jury trial.<br>• Preference actions "constitute no part of the proceedings in bankruptcy but concern controversies arising out of it." |
| *Katchen v. Landy* | 1966 | • Bankruptcy courts have summary jurisdiction to decide preference actions when the defendant has filed a proof of claim.<br>• When the preference action "arises as part of the process of allowance and disallowance of claims, it is triable in equity."<br>• A defendant in a preference action is therefore not entitled to a jury trial if that defendant has filed a proof of claim. |
| *Granfinanciera, S.A. v. Nordberg* | 1989 | • A fraudulent transfer action under § 548 of the Bankruptcy Code is a legal action when it is asserted against a defendant that has not filed a proof of claim.<br>• The public rights doctrine does not apply to fraudulent transfer actions.<br>• A defendant in a § 548 fraudulent transfer action is therefore entitled to a jury trial if that defendant has not filed a proof of claim. |
| *Langenkamp v. Culp* | 1990 | • A defendant in a preference action is not entitled to a jury trial if that defendant has filed a proof of claim.<br>• The Court noted in dicta that a defendant would be entitled to a jury trial if it had not filed a proof of claim. |
| *Central Virginia Community College v. Katz* | 2006 | • Bankruptcy jurisdiction is fundamentally *in rem* jurisdiction.<br>• It was not necessary to determine whether actions to recover preferential transfers are actually *in rem*.<br>• Actions to recover preferential transfers involve either *in rem* adjudication or orders ancillary to the bankruptcy courts' *in rem* jurisdiction, either of which suffices to establish the Court's authority to issue a judgment. |

*Granfinanciera*, *Katchen*, *Langenkamp*, and *Schoenthal*, taken together, imply that § 547 claims fall outside the public rights doctrine. But *Katz—the most recent pronouncement—* weighs heavily in the other direction.

The public rights doctrine originally applied to disputes between an individual and the government.  Because such disputes "could only be brought if the Federal Government chose to allow it by waiving sovereign immunity," Congress could choose to have the disputes decided by a non-Article III tribunal.  *Stern*, 131 S.Ct. at 2612 (citing *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 283-84 (1856)).  Disputes between individuals, on the other hand, were regarded as "private rights" disputes.  *See Crowell v. Benson*, 285 U.S. 22, 51 (1932) (defining private rights as "the liability of one individual to another under the law").  But in *Thomas v. Union Carbide Agricultural Products Co.*, the Supreme Court held that a right established under a public regulatory scheme "bears many of the characteristics of a 'public' right," even when the right is asserted between individuals.  473 U.S. 568, 585 (1985).  Under *Thomas*, Congress "may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary."  *Id.* at 594.

In *Stern*, however, the Court clarified that "it is still the case that what makes a right 'public' rather than private is that the right is integrally related to particular federal government action."  *Stern*, 131 S.Ct. at 2613.  The Supreme Court "limit[s] the exception to cases in which the claim at issue derives from a federal regulatory scheme, or in which resolution of the claim by an expert government agency is deemed essential to a limited regulatory objective within the agency's authority."  *Id.*

A delegation theory may allow bankruptcy courts to exercise authority over some common bankruptcy matters, such as confirming plans, approving sales of estate property, and granting or denying discharges.  The Article III judiciary may delegate non-adjudicative functions without implicating the judicial power.  Common examples of such delegation range

from clearly non-adjudicative functions, such as a Clerk of Court's holding and investing money in the court registry, to matters that are more closely related to the substance of disputes, such as a court-appointed receiver running a business.  A bankruptcy court's administration of many bankruptcy matters is similar to a trustee or receiver's administration of a *res* and may not implicate the judicial power.  However, the Court has identified no established doctrine other than the public rights doctrine that allows bankruptcy courts to adjudicate disputes that closely resemble traditional private rights disputes.

This Court concludes that the resolution of certain fundamental bankruptcy issues falls within the public rights doctrine.  The Supreme Court has never decided the question, but it noted in dicta in *Northern Pipeline Construction Co. v. Marathon Pipe Line Co.* that "the restructuring of debtor-creditor relations may well be a 'public right.'"  458 U.S. 50, 71 (1982).  The Supreme Court stepped back from this statement in *Granfinanciera* and *Stern*, clarifying that it "did not mean to 'suggest that the restructuring of debtor-creditor relations is in fact a public right.'"  *Stern*, 131 S.Ct. at 2614 n.7 (quoting *Granfinanciera*, 492 U.S. at 56 n.11).  However, the Supreme Court did not state that fundamental bankruptcy matters are not public rights: "Because neither party asks us to reconsider the public rights framework for bankruptcy, we follow the same approach here." *Id.*

Although the Supreme Court's opinion in *Stern* explicitly did not reconsider the public rights framework for bankruptcy, it did emphasize that its ruling was "narrow" and that "we are not convinced that the practical consequences of such limitations on the authority of bankruptcy courts to enter final judgments are as significant as Vickie and the dissent suggest."  Because the opinion assumes that its impact on the day-to-day activities of bankruptcy courts will not be radical, this Court concludes that after *Stern*, most fundamental bankruptcy matters must fall

within bankruptcy courts' constitutional authority. *Katz* provides guidance as to which matters are fundamental: "Critical features of every bankruptcy proceeding are the exercise of exclusive jurisdiction over all of the debtor's property, the equitable distribution of that property among the debtor's creditors, and the ultimate discharge that gives the debtor a 'fresh start' by releasing him, her, or it from further liability for old debts." 546 U.S. at 363-64. Many of these critical features are disputed matters, and they could be decided by the bankruptcy courts only through the public rights doctrine.

The application of the public rights doctrine to bankruptcy is consistent with the Supreme Court's teachings. In *Thomas*, the Supreme Court held that "Congress, acting for a valid legislative purpose pursuant to its constitutional powers under Article I, may create a seemingly 'private' right that is so closely integrated into a public regulatory scheme as to be a matter appropriate for agency resolution with limited involvement by the Article III judiciary." 473 U.S. at 593-94.

Because *Thomas* links the public rights doctrine to Congress' Article I powers, the doctrine has particular force in the bankruptcy context. While most public regulatory schemes are passed pursuant to Congress' powers under the Commerce Clause, the Bankruptcy Code is passed pursuant to Congress' specialized powers under the Bankruptcy Clause. The bankruptcy power is unique. In *Katz*, for example, the Supreme Court held that the Bankruptcy Clause—unlike the Commerce Clause—incorporates a waiver of states' sovereign immunity with respect to "proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts." 546 U.S. at 378.

Bankruptcy has always been a distinctly public concern: "Historically, financial distress was considered a public problem, which required public responses. The earliest forms of

response were quintessentially public: incarceration in debtors' prison or worse.  Relief from

debt was also quintessentially public."  Jonathan C. Lipson, *Debt and Democracy:  Towards a

Constitutional Theory of Bankruptcy*, 83 Notre Dame L. Rev. 605, 647 (2008).  Because

bankruptcy is a federal public concern, it was specifically mentioned in the Constitution.  *See

Katz*, 546 U.S. at 363 ("Foremost on the minds of those who adopted the [Bankruptcy] Clause

were the intractable problems, not to mention the injustice, created by one State's imprisoning of

debtors who had been discharged (from prison and of their debts) in and by another State."); *see

generally The Federalist* No. 42 (James Madison) ("The power of establishing uniform laws of

bankruptcy is so intimately connected with the regulation of commerce, and will prevent so

many frauds where the parties or their property may lie or be removed into different States, that

the expediency of it seems not likely to be drawn into question.").

At the time of the framing of the Constitution, the tensions created by debtor-creditor

relations had already proven a threat to political stability.  In the early 1780s, the post-

Revolutionary War depression had brought these tensions to a head in western Massachusetts:

> [D]ebt collection suits flooded the courts and imprisoned debtors
> crammed the jails. . . . Desperate, [the debtors] responded with the
> weapons they had learned to use against Great Britain.  They met
> in town meetings and county conventions, from which they
> petitioned the legislature in Boston for paper money, tender acts,
> stay laws, and tax relief.  When rebuffed, they closed the courts
> and took up arms.

Bruce Mann, *Republic of Debtors* 180-81 (2002).  This quickly suppressed debtors' revolt,

known as Shays's Rebellion, *id.* at 181, was only the most dramatic example of "serious civil

unrest among agrarian debtors in various parts of the country."  Charles M. Yablon, *Madison's

Full Faith and Credit Clause: A Historical Analysis*, 33 Cardozo L. Rev. 125, 148 (2011).

Shays's Rebellion "gave urgency to the growing effort to replace the Articles of Confederation with a more effective national government and was firmly in the minds of the delegates to the Constitutional Convention when they convened in Philadelphia few months later."  Mann, *supra*, at 181.  In *The Federalist* No. 10, James Madison, alluding to the debtors' demands for paper money and debt relief,  argued that a stronger federal government would be less susceptible to political instability caused by economic tensions:

> The influence of factious leaders may kindle a flame within their particular States but will be unable to spread a general conflagration through the other States. . . . A rage for paper money, for an abolition of debts, for an equal division of property, or for any other improper or wicked project, will be less apt to pervade the whole body of the Union than a particular member of it, in the same proportion as such a malady is more likely to taint a particular county or district than an entire state.

*The Federalist* No. 10 (James Madison).   The federal power to regulate debtor-creditor relationships was thought to be essential to maintaining a stable Union:

> [T]he most common and durable source of factions has been the various and unequal distribution of property.  Those who hold and those who are without property have ever formed distinct interests in society.  Those who are creditors, and those who are debtors, fall under a like discrimination.  A landed interest, a manufacturing interest, a mercantile interest, a moneyed interest, with many lesser interests, grow up of necessity in civilized nations, and divide them into different classes, actuated by different sentiments and views. The regulation of these various and interfering interests forms the principal task of modern legislation and involves the spirit of party and faction in the necessary and ordinary operations of government.

*The Federalist* No. 10 (James Madison).

Accordingly, this Court concludes that at the time the Bankruptcy Clause was incorporated into Article I, bankruptcy was a distinctly political matter: the stability of debtor-creditor relationships was closely linked to the viability of the republic.  The Bankruptcy Clause

gives Congress the power to regulate debtor-creditor relations at least in part for the purpose of protecting the entire constitutional scheme.  The bankruptcy power thus involves uniquely public concerns.

The bankruptcy statutes, passed pursuant to this unique bankruptcy power, are different from typical public regulatory schemes.  The bankruptcy scheme's objectives are not merely permissible policies chosen by Congress: they are incorporated into the Constitution itself.  In typical regulatory schemes, a concern for the efficiency of the scheme provides a counterweight to Article III concerns.  *Stern*, 131 S.Ct. at 2614 (discussing *Commodity Futures Trading Commission v. Schor*, 478 U.S. 833, 856 (1986), and noting that "the Court repeatedly emphasized that it was 'necessary' to allow the agency to exercise jurisdiction over the broker's claim, or else 'the reparations procedure would have been confounded'").  Because the bankruptcy scheme's objectives are constitutional policies, not merely legislative policies, the effective functioning of the bankruptcy scheme is an even weightier concern.

The bankruptcy scheme is therefore a unique public rights scheme, and the public rights doctrine applies at least to fundamental bankruptcy matters.  The issue, then, is to determine which matters fall within the bankruptcy scheme.  *Stern* makes clear that not all matters connected to a bankruptcy case fall within bankruptcy courts' constitutional authority.  *Stern* also provides some guidance for determining where the line is drawn:  "the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process."  131 S.Ct. at 2618.  This formulation could be read as a bankruptcy-specific application of *Thomas*' "integrated into a public regulatory scheme" test.  473 U.S. at 594.

To determine whether an issue "stems from the bankruptcy itself," the Court considers whether the disputed right is established by the Bankruptcy Code or whether the substantive

outcome of the issue is in any way affected by bankruptcy law.  *See Yazoo Pipeline*, --- B.R. ----,

2011 WL 4902960, at *1.  When the substantive outcome of a non-bankruptcy law claim is

affected by bankruptcy law, the claim may be "transformed" into a bankruptcy matter.  *Id.*; *cf.*

*Germain v. Conn. Nat'l Bank*, 988 F.2d 1323, 1330 (2d Cir. 1993) (holding that, with respect to

jury rights, a creditor's consent to a bankruptcy court's *in rem* jurisdiction transforms the

character of the claim from legal to equitable, but that this transformation does not affect

"disputes that are only incidentally related to the bankruptcy process").

To determine whether a matter "would necessarily be resolved in the claims allowance

process," the Court considers whether the matter can be resolved through the exercise of *in rem*

jurisdiction over the bankruptcy estate or whether the proceeding is necessary to effectuate such

*in rem* jurisdiction.  *Cf. Katz*, 546 U.S. at 378 (holding that states implicitly consented to a

subordination of sovereign immunity to the extent necessary to effectuate bankruptcy courts' *in*

*rem* jurisdiction).

Bankruptcy jurisdiction, since the time of the framing, has been "principally *in rem*

jurisdiction."  *Id.* at 370.  Under English bankruptcy law, the bankruptcy court had the authority

"to deal only with that which is the bankrupt's estate; but [had] no power to determine what *is*

the bankrupt's estate."  *Halford v. Gillow*, 60 E.R. 18, 20 (Ch. 1842).[1]  English law recognized a

clear distinction between legal or equitable disputes and the administration of the bankruptcy

---

[1] Although *Halford* was decided in 1842, half a century after the ratification of the Constitution, the Court of
Chancery discusses principles of bankruptcy jurisdiction that existed in the late 18th century.  *See* John C. McCoid,
II, *Right to Jury Trial in Bankruptcy: Granfinanciera, S.A. v. Nordberg*, 65 Am. Bankr. L.J. 15, 29-31 (1991) ("In
1571, the Elizabethan statute modified the [bankruptcy jurisdiction] scheme.  It vested bankruptcy jurisdiction
exclusively in the Lord Chancellor who was expressly authorized on written complaint of an act of bankruptcy to
appoint commissioners under the Great Seal.  It was the commissioners who took the bankrupt's property, assigned
it, and distributed the proceeds to creditors who had proved their claims.  This power was said to combine legal and
equitable jurisdiction. . . . While the whole administration of the bankrupt fell under this jurisdiction, it did not
extend to determining what was the bankrupt's estate.") (citing *Halford*, 60 E.R. at 20).  In 1831, Parliament
established "The Court of Bankruptcy," which inherited the Lord Chancellor's bankruptcy jurisdiction.  *Id.* at 31.
Bankruptcy commissioners exercised the same powers under the new law.  *Id.*

estate: "If the question be a legal one it must be tried at law; and if it be an equitable one, it must be decided in [the Court of Chancery].  But when you have determined what is the property of the bankrupt, the whole administration of it falls under the jurisdiction of the Court in bankruptcy."  *Id.*; *see generally* Ralph Brubaker, *Article III's Bleak House (Part I): The Statutory Limits of Bankruptcy Judges' Core Jurisdiction*, 31 Bankr. L. Letter, no. 8, 2011 at 5-6 (discussing the historical evolution of bankruptcy processes).

From the nineteenth century until the Bankruptcy Code was enacted in 1978, American bankruptcy law preserved this distinction between administrative authority over the estate and the authority to decide legal or equitable disputes over what was included in the estate.  The administrative authority was known as "summary jurisdiction," while legal or equitable disputes over the extent of the property of the estate required a "plenary action."  *Katchen v. Landy*, 382 U.S. 323, 327-28 (1966).  Under the Bankruptcy Act, summary jurisdiction included the authority "to adjudicate controversies relating to property over which [the bankruptcy courts had] actual or constructive possession."  *Id.* at 327 (quoting *Thompson v. Magnolia Petroleum Co.*, 309 U.S. 478, 481 (1940)).  Summary jurisdiction also included "matters of an administrative character, including questions between the bankrupt and his creditors, which are presented in the ordinary course of the administration of the bankrupt's estate."  *Id.* (quoting *Taylor v. Voss*, 271 U.S. 178, 181 (1926)).

Bankruptcy referees, who were not Article III judges, could exercise summary jurisdiction, but could not decide plenary matters.  Brubaker, *Part I*, *supra*, at 7 ("Pursuant to the Supreme Court's decisions, a referee had no jurisdiction over plenary matters; but the referee's summary jurisdiction was indistinguishable from that of the district court[.]").  Summary matters could proceed more informally and expeditiously than plenary actions.  *Id.*  And summary

matters were not subject to jury rights, while plenary actions were.[2]  *Katchen*, 382 U.S. at 335-36.  The Bankruptcy Act thus implemented the long-standing distinction between matters falling within bankruptcy courts' fundamental *in rem* jurisdiction and matters that were less closely tied to the claims adjudication process.  *See id.* at 336 ("[W]hen the same issue arises are part of the process of allowance and disallowance of claims, it is triable in equity.").

The distinction between plenary and summary jurisdiction was eliminated by the 1978 Bankruptcy Reform Act.  *See Marathon*, 458 U.S. at 54 ("Eliminating the distinction between 'summary' and 'plenary' jurisdiction, the Act grants the new [bankruptcy] courts jurisdiction over all 'civil proceedings arising under title 11 [the Bankruptcy title] or arising in or *related to* cases under title 11.'") (quoting the Bankruptcy Reform Act).  As is well known, the Supreme Court held in *Marathon* that this expansive grant of jurisdiction was unconstitutional.  *Id.* at 87.

In response, Congress amended 28 U.S.C. § 1334, which grants district courts subject matter jurisdiction over bankruptcy cases and proceedings that arise under the Bankruptcy Code, arise in a bankruptcy case, or are related to a bankruptcy case.  Congress also passed the referral statute, 28 U.S.C. § 157, which allows district courts to refer bankruptcy matters to bankruptcy judges.  The referral statute introduces the distinction between core and non-core proceedings—a distinction that resembles, but does not align precisely, with the plenary/summary distinction.  Congress' attempt to resolve the constitutional problems that were at issue in *Marathon* was

---

[2]  The Supreme Court noted in *Katchen* that the Bankruptcy Act did not grant bankruptcy courts summary jurisdiction over preference actions.  382 U.S. at 335-36.  Although, as *Katchen* stated, the Bankruptcy Act did not include preference actions within the bankruptcy courts' statutory *in rem* jurisdiction, this conclusion does not control whether, under the Bankruptcy Code and constitutional principles, preference actions under § 547 cannot be decided pursuant to bankruptcy courts' *in rem* jurisdiction.  The *Katchen* Court relied on *Schoenthal*'s earlier ruling that preference actions were legal, not equitable actions.  As discussed extensively below, this Court concludes that *Katz* broke significantly from *Katchen* and *Schoenthal*.  Under the Supreme Court's more recent discussion of the nature of *in rem* jurisdiction in *Katz*, preference actions fall within or are closely tied to the bankruptcy courts' *in rem* jurisdiction.

unsuccessful: *Stern* held that some matters that fall within the statutory definition of "core proceedings" do not fall within bankruptcy courts' constitutional authority.  131 S.Ct. at 2620.

Professor Brubaker has argued that the plenary/summary distinction—rather than the statutory core/non-core distinction—marks the true constitutional extent of bankruptcy courts' authority.  Ralph Brubaker, *Article III's Bleak House (Part II):  The Constitutional Limits of Bankruptcy Judges' Core Jurisdiction*, 31 Bankr. L. Letter, no. 9, 2011 at 4 ("Thus it seems that *Marathon* essentially constitutionalized the 1898 Act's divide between summary and plenary proceedings, or at least was the first step in that direction because the same phenomenon repeated itself even more conspicuously in *Granfinanciera*.").

The historical understanding of the plenary/summary distinction informs, but does not dictate, the Court's analysis of whether matters are integrally related to the claims adjudication process.  Following the traditional distinction, this Court reads *Stern*'s consideration of "whether the action at issue . . . would necessarily be resolved in the claims allowance process" as calling for an examination of whether the action falls within the Bankruptcy Court's *in rem* jurisdiction.  However, the Court interprets the reach of bankruptcy courts' *in rem* jurisdiction in light of the Supreme Court's most recent analysis, as set forth in *Katz*.

The Court concludes that preference actions both stem from the bankruptcy itself and are decided primarily pursuant to *in rem* jurisdiction.

The cause of action for preferential transfers is established by the Bankruptcy Code.  The provision for recovering preferences is integrally bound up in the overall scheme for ensuring equitable distribution among creditors.  Preferential transfers are payments for legitimate debts.  Preferences are avoidable precisely because they enable some creditors to receive more than their fair distribution under the Bankruptcy Code.  The entire purpose of the cause of action,

then, is to enforce the Bankruptcy Code's equality of distribution.  In this respect, preferential transfer actions are fundamentally different from fraudulent transfer actions, although the two causes of action superficially resemble.  As *Granfinanciera* held, fraudulent transfer actions primarily seek to augment the bankruptcy estate.  492 U.S. at 56.  Fraudulent transfer actions are not necessarily asserted against entities that were ever legitimate creditors of the debtor.  Preferential transfer actions, in contrast, are part of the administration of the estate: they are concerned with determining the amounts of claims under the Bankruptcy Code.

And unlike fraudulent transfer actions, preference actions are decided pursuant to bankruptcy courts' *in rem* jurisdiction over the estate. This is because, under the Bankruptcy Code, amounts that are preferentially transferred were always really part of the bankruptcy estate.  *See Katz*, 546 U.S. at 371-72 (discussing "[t]he interplay between *in rem* adjudications," a category that implicitly includes § 547 actions, and "orders ancillary thereto" and characterizing a § 550(a) action to recover a preferential transfer as an action "to marshal the entirety of the debtor's estate").[3]

*Katz* stated that recovery of a preference may be necessary to effectuate the bankruptcy courts' *in rem* jurisdiction over the estate.  When the trustee seeks recovery under § 550(a), a court order mandating turnover may technically involve *in personam* process, but the order is "ancillary to and in furtherance of the court's *in rem* jurisdiction." *Id.* at 372.  The recovery of a preference is thus different in kind from the adjudication of a legal claim owned by the estate,

---

[3] It could be argued that *any* amounts affirmatively recovered for the bankruptcy estate—including any recovery on the basis of claims belonging to the estate—were, in some sense, always part of the bankruptcy estate.  But this conclusion would go too far.  Section 547 acts within a limited sphere to define certain assets as belonging to the bankruptcy estate.  These assets are part of the bankruptcy estate solely because of the Bankruptcy Code itself and solely to enforce the Bankruptcy Code's distribution scheme.  A bankruptcy court's determination that a transfer is avoidable under § 547 is more akin to a determination that a particular asset falls within the provisions of § 541 than to deciding the merits of a claim owned by the estate—a determination that may not fall within a bankruptcy court's statutory core jurisdiction.  Congress likely would not have the authority under the Bankruptcy Clause to define the bankruptcy estate so expansively.

which involves the exercise of *in personam* jurisdiction for the purposes of augmenting the estate, not just administering it.  *See Granfinanciera*, 492 U.S. at 56 (holding that fraudulent conveyance actions "are quintessentially suits at common law that more nearly resemble state-law contract claims brought by a bankrupt corporation to augment the bankruptcy estate than they do creditors' hierarchically ordered claims to a pro rata share of the bankruptcy res").  This conclusion is true only if bankruptcy courts' *in rem* jurisdiction rightfully includes jurisdiction over the preferentially transferred property—otherwise, the use of *in personam* process would not be simply "ancillary to" a court's *in rem* jurisdiction.

Because the bankruptcy courts' *in rem* jurisdiction applies only to property of the estate, the preferentially transferred property must actually be property of the estate.  In essence, the effect of § 547 is to define the *res* as of 90 days before the petition (one year for transfers to insiders).  If the antecedent 90-day *res* was distributed inequitably, the Bankruptcy Code merely provides for its equitable distribution.  The situation is closely analogous to the recovery of a post-petition transfer under § 549.  Section 549 restores to the estate the *res* as it existed on the petition date; § 547 restores the *res* as it existed 90 days before the petition date.  There is no serious question that a § 549 cause of action is within the bankruptcy court's *in rem* authority.  *See In re M & L Business Machine Co. v. Youth Benefits Unlimited, Inc.,* 59 F.3d 1078, 1082 (10th Cir. 1995) (holding that jury rights do not attach to § 549 actions because they are "equitable in nature").

Congress has the constitutional authority to define preferentially transferred assets as part of the estate and to grant authority over the property to bankruptcy courts.  The authority to recover preferences "has been a core aspect of the administration of bankruptcy estates since at least the 18th century."  *Katz*, 546 U.S. at 377.  Section 547 includes reasonable limitations on

the property subject to bankruptcy courts' authority: a 90-day preference period for non-insider transfers, a one-year preference period for insider transfers, an antecedent debt requirement, and an insolvency requirement. The limited recovery allowed under § 547 is consistent with history and rationally related to the purposes of the Bankruptcy Clause.

Preference actions therefore may be resolved through the exercise of a bankruptcy court's *in rem* jurisdiction over the bankruptcy estate, and preferences may be recovered through orders ancillary to the court's *in rem* jurisdiction. *Id.* This outcome is most obvious when the defendant has filed a proof of claim against the estate and the amount sought is not more than the amount of the defendant's claim. When the defendant has filed a proof of claim against the estate, the claim is disallowed under § 502(d) of the Bankruptcy Code unless the defendant has returned the amount of the transfer. As *Katz* points out, a § 547 determination may therefore be sufficient, without an § 550(a) order mandating turnover, to incentivize the defendant to turn over the preference.

Once the estate recovers the amount of the transfer, the amount recovered does not offset the defendant's claim; it increases it. Because the preferential payment was made on account of a valid antecedent debt, the (now unpaid) amount of that debt is added to the defendant's claim against the estate. Resolution of the defendant's claim against the estate therefore requires a determination of whether any transfers are avoidable under § 547.

Because the recovery of preferences does not offset, but rather increases, a defendant's claim against the estate, there is no fundamental reason why a preference action in which the estate seeks to recover an amount greater than the defendant's claim against the estate should be treated differently. *Katz* suggests that the mere determination of avoidance falls within the court's *in rem* jurisdiction. Even if the estate seeks a turnover order under § 550(a), a

bankruptcy court may issue such an order "ancillary to and in furtherance of the court's *in rem* jurisdiction." *Id.* at 372. And the claim is similarly intertwined with the claims-allowance process: because § 502(d) still applies, a bankruptcy court must determine the full amount that must be paid back to the estate before the defendant's claim can be allowed.

Finally, the same result occurs even when the defendant has not filed a proof of claim against the estate. The determination of avoidance falls within the bankruptcy court's *in rem* jurisdiction over the estate. Because the preferentially transferred property is part of the bankruptcy estate, a turnover order under § 550(a) would be in furtherance of the bankruptcy court's *in rem* jurisdiction. And even when the defendant has not filed a proof of claim, the preference action is necessary to determine the amount of the defendant's claim against the estate on the basis of the antecedent debt.

The result of a successful preferential transfer claim is to make the defendant a creditor of the estate or to increase the amount of the defendant's claim against the estate. Transfers are avoidable as preferences only if they were made on account of an antecedent debt and enabled the recipient creditor to receive more than that creditor would receive in a chapter 7 distribution, if the transfer had not been made, and if the creditor received payment to the extent provided by the Bankruptcy Code. 11 U.S.C. § 547(b). Transfer recipients are, in this sense, treated as creditors of the estate even when they have not filed a proof of claim: they are subject to the same distribution rules. Even more importantly, if the transferred property is recovered for the bankruptcy estate, the antecedent debt for which the transfer was made will then be unpaid. 11 U.S.C. § 502(h) ("A claim arising from the recovery of property under section 522, 550, or 553 of this title shall be determined, and shall be allowed under subsection (a), (b), or (c) of this section, or disallowed under subsection (d) or (e) of this section, the same as if such claim had

arisen before the date of the filing of the petition."); *e.g.*, *Cnty. of Sacramento v. Hackney (In re Hackney)*, 93 B.R. 213, 216 (Bankr. N.D. Cal. 1988) ("Section 550 includes in its coverage preferences avoided by the trustee under 11 U.S.C. § 547. Bankruptcy Rule 3002(c)(3) gives the transferee thirty days from the date the judgment avoiding the transfer becomes final to file a proof of claim against the estate. Thus, clearly, under 11 U.S.C. § 502(h), the recipient of a preference who is forced to surrender a preference to a bankruptcy trustee has the right to file a claim against the debtor's bankruptcy estate.")   The defendant thus becomes a creditor of the estate, even if the defendant had not previously filed a proof of claim.   A § 547 action therefore, by its nature, involves a determination of whether the defendant is a creditor of the estate.

The following hypothetical example should be useful to an understanding of the effect of a § 547 preference recovery:

### *Outcome of Successful § 547 Actions*

|  | **Defendant A:** Claim Exceeds Amount of Preferential Transfer | **Defendant B:** Preferential Transfer Amount Exceeds Claim | **Defendant C:** No Proof of Claim |
|---|---|---|---|
| **Amount of Proof of Claim** | $15,000 | $5,000 | No proof of claim. |
| **Amount of Avoided Preference** | $10,000 | $10,000 | $10,000 |
| **Defendant's Claim After Avoidance and Recovery** | $25,000<br><br>(the amount of the original claim plus the amount now owed on account of the antecedent debt that had been paid pre-petition) | $15,000<br><br>(the amount of the original claim plus the amount now owed on account of the antecedent debt that had been paid pre-petition) | $10,000<br><br>(the amount of the original claim plus the amount now owed on account of the antecedent debt that had been paid pre-petition) |
| **Other Effects** | Creditor receives no distribution on account of original $15,000 claim until the $10,000 preference is repaid | Creditor receives no distribution on account of original $5,000 claim until the $10,000 preference is repaid | n/a |

Preference actions stem from the bankruptcy itself and would necessarily be resolved in the claims allowance process.  They fall within the boundaries of the public rights doctrine.  The Court must, however, deal with *Schoenthal*, *Granfinanciera*, and *Langenkamp*.

*Schoenthal*, as discussed above, explicitly held that preference actions were separate legal actions, not part of the "proceedings in bankruptcy."  287 U.S. at 95.  Because the actions were tried at law, the defendants were entitled to a jury trial.  *Id.* at 96.  Building on *Schoenthal*'s holding regarding preferences, *Granfinanciera* held that a fraudulent transfer action under § 548 of the Bankruptcy Code did not fall within the public rights exception when the defendant had not filed a proof of claim against the bankruptcy estate.  492 U.S. at 55.  The defendant was therefore entitled, under the Seventh Amendment, to have the claim tried by a jury.  *Id.* at 58-59.  The *Granfinanciera* Court noted that "petitioners here . . . have not filed claims against the estate, [and therefore] respondent's fraudulent conveyance action does not arise 'as part of the process of allowance and disallowance of claims.'  Nor is that action integral to the restructuring of debtor-creditor relations."  492 U.S. at 58.

In addition to citing *Schoenthal*, *Granfinanciera* favorably quoted this dictum from *Katchen*, which also dealt with jury rights in a preferential transfer action under the Bankruptcy Act: "But although petitioner might be entitled to a jury trial on the issue of preference if he presented no claim in the bankruptcy proceeding and awaited a federal plenary action by the trustee, when the same issue arises as part of the process of allowance and disallowance of claims, it is triable in equity."  382 U.S. at 336 (citation omitted) (citing *Schoenthal*, 287 U.S. 92).

In *Langenkamp*, the Supreme Court held that a creditor who had filed a proof of claim against a bankruptcy estate was not entitled to a jury in a preferential transfer action:

> [B]y filing a claim against a bankruptcy estate the creditor triggers the process of "allowance and disallowance of claims," thereby subjecting himself to the bankruptcy court's equitable power. If the creditor is met, in turn, with a preference action from the trustee, that action becomes part of the claims-allowance process which is triable only in equity. In other words, the creditor's claim and the ensuing preference action by the trustee become integral to the restructuring of the debtor-creditor relationship through the bankruptcy court's *equity jurisdiction*. As such, there is no Seventh Amendment right to a jury trial.

498 U.S. at 44-45. As in *Katchen*, the Court noted in dicta, "If a party does *not* submit a claim against the bankruptcy estate, however, the trustee can recover allegedly preferential transfers only by filing what amounts to a legal action to recover a monetary transfer. In those circumstances the preference defendant is entitled to a jury trial." *Langenkamp,* 498 U.S. at 45.

The Supreme Court's holding in *Schoenthal* and dicta in *Katchen*, *Granfinanciera*, and *Langenkamp* indicate that jury rights attach to preferential transfer actions against defendants that have not filed proofs of claim. Jury rights, *Granfinanciera* says, attach only when the public rights doctrine does not apply:

> [O]ur decisions point to the conclusion that, if a statutory cause of action is legal in nature, the question whether the Seventh Amendment permits Congress to assign its adjudication to a tribunal that does not employ juries as factfinders requires the same answer as the question whether Article III allows Congress to assign adjudication of that cause of action to a non-Article III tribunal.

*Granfinanciera*, 492 U.S. at 53. Although all of these statements are dicta, if they are correct, preferential transfer claims fall outside the public rights doctrine for both Seventh Amendment and Article III purposes.

This Court concludes that *Schoenthal* and the dicta in *Katchen*, *Granfinanciera*, and *Langenkamp*, are effectively overruled by the Supreme Court's later holding in *Katz*.

As discussed above, *Katz* held that preferential transfer actions are resolved through the exercise of *in rem* jurisdiction and through orders "ancillary to and in furtherance of the court's *in rem* jurisdiction." 546 U.S. at 378. The *Katz* Court explicitly did not decide "whether actions to recover preferential transfers pursuant to § 550(a) are themselves properly characterized as *in rem*." *Id.* at 372. However, the close connection between preferential transfer actions and the bankruptcy courts' *in rem* jurisdiction was essential to the Court's holding:

> [The] States agreed in the plan of the Convention not to assert any sovereign immunity defense they might have had in proceedings brought pursuant to "Laws on the subject of Bankruptcies." The scope of this consent was limited; the jurisdiction exercised in bankruptcy proceedings was chiefly *in rem*—a narrow jurisdiction that does not implicate state sovereignty to nearly the same degree as other kinds of jurisdiction. But while the principal focus of the bankruptcy proceeding is and was always the res, some exercises of bankruptcy courts' powers—issuance of writs of habeas corpus included—unquestionably involved more than mere adjudication of rights in a res. In ratifying the Bankruptcy Clause, the States acquiesced in a subordination of whatever sovereign immunity they might otherwise have asserted in proceedings necessary to effectuate the *in rem* jurisdiction of the bankruptcy courts.

*Katz*, 546 U.S. at 377-78 (citations omitted). The recovery of preferences, under *Katz*'s reasoning, either falls within the bankruptcy courts' *in rem* jurisdiction or is essential to effectuate the *in rem* jurisdiction of the bankruptcy courts. Moreover, the "mere declaration of avoidance" under § 547, the *Katz* Court suggests, involves *in rem* jurisdiction. 546 U.S. at 371-72 (noting that "[t]he § 547 determination, standing alone, operates as a mere declaration of avoidance" and that the trustee may need to recover the transfers under § 550(a), which could "involve *in personam* process" that is ancillary to the court's *in rem* jurisdiction).

Accordingly, we conclude that § 547 declarations are an exercise of the Bankruptcy Court's *in rem* authority. Although it is a closer call, we also conclude that a § 550(a) recovery of a declared § 547 preference is an appropriate exercise of the Bankruptcy Court's ancillary

authority under *Katz.  Cf. Morrison v. Western Builders of Amarillo, Inc. (In re Morrison)*, 555 F.3d 473 (5th Cir. 2009) (holding that, in addition to having the authority to declare a debt nondischargeable under § 523, bankruptcy courts—for reasons of both pragmatism and tradition—have ancillary authority to liquidate the debt).

The *Katz* Court broke significantly from the *Schoenthal/Katchen/Langenkamp* line of cases, which regarded preference actions as legal actions that were not inextricably linked to the claims adjudication process unless the defendant had filed a proof of claim.  The *Schoenthal* Court viewed preference actions as separate legal proceedings.  *Katz* articulated a very different view: preference actions fall within, or are an inextricable extension of, bankruptcy courts' basic *in rem* jurisdiction over the bankruptcy estate.  *Schoenthal* relies on the traditional line—seen in *Halford* and in the American plenary/summary jurisdiction distinction—between legal and equitable causes of action and the administration of the bankruptcy estate.  *Katchen* began to blur that line by recognizing that legal claims can be transformed into bankruptcy proceedings when they are part of the claims allowance process.  *Katz*'s analysis of the expansive reach of bankruptcy courts' fundamental *in rem* jurisdiction must be seen to overrule *Schoenthal*'s conclusion that preference actions are not part of the proceedings in bankruptcy.

Considering *Thomas*' broadened definition of public rights, the unique public concerns in the bankruptcy context, the close integration of all preferential transfer actions into the claims adjudication process, and *Katz*'s characterization of preferential transfer determinations and recovery actions as *in rem* or ancillary to *in rem* actions, the Court concludes that the determination and recovery of preferential transfers falls within the public rights doctrine. Actions to determine or recover preferences are so closely integrated into the public bankruptcy scheme that they may be finally adjudicated by non-Article III bankruptcy judges.

## Conclusion

The Court has constitutional authority to adjudicate the four adversary proceedings.  The defendants in two of the adversary proceedings—Nos. 11-3213 and 11-3310—filed proofs of claim, and the adjudication of those preference actions is part of the claims-allowance process under *Katchen* and *Langenkamp*.  Even in the two adversaries involving defendants that did not file proofs of claim, the public rights doctrine allows the Court to adjudicate the Trustee's claims for avoidance and recovery of preferential transfers.

Separate orders will be issued dismissing adversary Nos. 11-3213, 11-3310, and 11-3423 with prejudice.  The Court will issue a default judgment in adversary No. 11-3422.

SIGNED **December 28, 2011.**

_____
Marvin Isgur
UNITED STATES BANKRUPTCY JUDGE